ULRICO S. ROSALES, State Bar No. 139809
Email: rrosales@wsgr.com
MEAGHAN SNYDER, State Bar No. 279392
Email: msnyder@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100

Attorneys for Plaintiff
CUTERA, INC.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CUTERA, INC., <br><br> Plaintiff, <br><br> v. <br><br> LUTRONIC AESTHETICS, INC., and Does 1-20. <br><br> Defendants. | CASE NO.: 2:20-CV-00235-KJM-DB <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUCTION AND FOR ORDER RE PRESERVATION OF EVIDENCE** <br><br> Before: The Hon. Kimberly J. Mueller <br> Magistrate Judge Deborah Barnes <br><br> Complaint Filed: January 31, 2020 <br> Jury Trial Demanded |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................ 1

II. STATEMENT OF FACTS .................................................................................. 2

    A. Lutronic Recruits and Induces Laber to Join With A Rich Contract; Laber Remains at Cutera as Ring Leader to Orchestrate Mass Defection of Cutera Employees to Obtain Its Trade Secrets, and to Compete Unfairly ........................ 2

    B. Cutera Believes that Lutronic's Employees Misappropriated Cutera Trade Secrets While Still Employed with Cutera, As Well as While Employed By Lutronic; Lutronic's Employees Also Deleted Cutera Trade Secret Information And Destroyed Evidence Relevant To This Case ............................... 3

    C. Cutera Has Invested Significant Resources Developing Its Trade Secrets. ........... 6

    D. Cutera Entrusted the Former Cutera Employees With Trade Secrets and They Were Obligated to Protect Cutera's Trade Secret Information ...................... 8

III. ARGUMENT ....................................................................................................... 9

    A. Cutera's Is Likely to Succeed on the Merits ............................................................ 9

        B. Cutera Will Be Irreparably Harmed If An Injunction Does Not Issue ...... 13

        C. The Balance of Equities Tips In Cutera's Favor. ...................................... 14

    D. An Injunction Is In The Public Interest. ................................................................ 15

    E. An Order Is Required To Prevent The Destruction Of Essential Evidence. ......... 15

IV. CONCLUSION ................................................................................................. 16

# TABLE OF AUTHORITIES

## CASES

Page

*Bernhardt v. L.A. Cnty.*, 339 F.3d 920 (9th Cir. 2003) ........................................................... 15

*Courtesy Temp. Serv., Inc. v. Camacho*, 222 Cal. App. 3d 1278 (1990) ....................................... 10

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61 (2d Cir. 1984) ............................... 15

*Hilderman v. Enea TekSci, Inc.*, 551 F. Supp. 2d 1183 (S.D. Cal. 2008) ...................................... 11

*Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed. Cir. 1988) ........................................ 14, 15

*Imi-Tech Corp. v. Gagliani*, 691 F. Supp. 214 (S.D. Cal. 1986) .................................................... 15

*Kwikset Corp. v. Superior Court*, 51 Cal 4th 310 (2011) ............................................................ 10

*MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511 (9th Cir. 1993) ........................................... 11

*Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911 (C.D. Cal. 2011) ..................................... 11

*Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514 (1997) .................................................................... 10

*Morton v. Rank Am., Inc.*, 812 F. Supp. 1062 (C.D. Cal. 1993) .................................................... 10

*Silvaco Data Sys.s v. Intel Corp.* 184 Cal. App. 4th 210 (2010) ................................................... 10

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009) ............................................................ 15

*Stuhlbarg Int'l. Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001) ........................ 9

*Vacco Indus., Inc. v. Van Den Berg*, 5 Cal. App. 4th 34 (1992) ................................................... 11

*Whyte v. Schlage, Lock Co.*, 101 Cal. App. 4th 1443 (2002) ........................................................ 10

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ....................................................... 9

## STATUTES

18 U.S.C. §1836(b)(3)(A) ................................................................................................................. 9

18 U.S.C. § 1839(3) ......................................................................................................................... 9

18 U.S.C. § 1839(5) ......................................................................................................................... 9

# I. INTRODUCTION

Plaintiff Cutera, Inc. ("Cutera" or "Plaintiff") has brought this action to counter and stop Lutronic Aesthetics, Inc. ("Lutronic") and its newly hired employees from continuing their deliberate campaign to steal Cutera's trade secrets, an effort that includes illegally soliciting and hiring Cutera employees for the very purpose of acquiring Cutera's secrets. In this application, Cutera seeks immediate assistance to prevent further irreparable harm to Cutera's business.

Rather than investing its own resources to develop the sales organization and infrastructure that Cutera enjoys, the evidence here establishes that Lutronic and its CEO, Haelyung Hwang, decided to cheat and get a head start by hiring Larry Laber, Cutera's Executive Vice President of Sales, so that he could, using Cutera trade secrets, in turn hire numerous other Cutera sales professionals to join him at Lutronic. Lutronic's Hwang lured Laber to Lutronic by offering him the role of Chief Commercial Officer, and a rich compensation package that included salary, a guaranteed bonus, equity in both the Korean parent and the U.S. company, and 2% of the sales revenue growth achieved over the prior year. Eager to reap the rewards of the outsized incentive Lutronic used to entice him, Laber set out to steal Cutera's valuable sales talent. In fact, he could not even wait until he left Cutera. Rather, while Hwang and Laber struck their deal in November 2019, Laber did not resign from Cutera until January 17, 2020. In the intervening two months, with Lutronic's knowledge and on its behalf, and in violation of his duty of loyalty and his contractual obligations to Cutera, Laber started soliciting and making arrangements to hire Cutera's sales employees such that when Laber finally quit, his scheme became obvious. He quit suddenly, with no notice, and had three other Cutera sales employees join him in doing so.

Not content to stop there, Lutronic and Hwang encouraged Laber and the other former employees to go after more Cutera employees. In fact, **Lutronic has since hired 8 additional employees in less than one month**, and just yesterday hired another one, for a total of **13 employees in approximately one month**.

Not only have Lutronic, Hwang and Laber orchestrated this mass defection of employees, Lutronic's employees have, in violation of applicable law and their Cutera agreements, stolen

Cutera trade secrets and subsequently destroyed Cutera information and evidence in order to hide their tracks. The evidence undisputedly shows that Lutronic's employees kept their Cutera computers, copied thousands of files and folders to external storage devices before and after they left Cutera, and even after being advised by counsel not to access their Cutera computers or destroy evidence, they did just that.

Because Lutronic's unfair competition and its employees' theft of trade secrets are causing Cutera irreparable harm, it asks this Court to grant immediate relief until a preliminary injunction motion can be heard—a motion that will lay bare even more of Lutronic's unlawful conduct.

## II. STATEMENT OF FACTS

### A. Lutronic Recruits and Induces Laber to Join With A Rich Contract; Laber Remains at Cutera as Ring Leader to Orchestrate Mass Defection of Cutera Employees to Obtain Its Trade Secrets, and to Compete Unfairly

Cutera is a medical device company that is engaged in the design, development, manufacture, marketing and servicing of laser and other energy-based aesthetics systems for practitioners across the world. Declaration of Shelby Eckerman ("Eckerman Decl.") ¶ 2. Defendant Lutronic is also a medical device company and develops and manufactures aesthetic and medical laser systems. *Id*. ¶ 8. Every Cutera customer or potential customer is almost by definition a potential Lutronic customer because the customer has a need for the products both companies sell and for virtually every product Cutera sells into each vertical market, Lutronic has a competitive product. *Id*.

Until January 17, Laber was Cutera's EVP of Sales. Eckerman Decl. ¶¶ 3-4. Evidence suggests that Lutronic likely initiated contact with Laber as early as February 2019, at which point Laber added Hwang as a contact, and that Laber visited Lutronic on May 6, 2019. Declaration of Kevin Clarke ("Clarke Decl.") ¶10. By November 10, 2019, Lutronic's CEO, Hwang, and Laber appear to negotiated sufficiently that Hwang sent Laber a term sheet, pursuant to which Lutronic offered him a salary of $480,000 per year, a $220,00 per year minimum bonus *guaranteed* for 2020 and 2021, "2% of the sales growth from previous year," 100,000 option shares in the Korean parent, and 250,000 option shares in the U.S. company, a one year severance package, and change

of control protection with accelerated vesting. *Id.*; Declaration of Ulrico Rosales ("Rosales Decl.") ¶2. Notwithstanding his deal with Lutronic, Laber did not resign his Cutera employment, rather he stayed employed there until he quit without notice on January 17, 2020. Eckerman Decl. ¶ 3. At that same time the other three Former Cutera Employees quit without notice. Forensics investigation has uncovered Ms. Kim's draft offer letter for Lutronic dated January 17, 2020, which is not even completed and asks her to "[PLEASE ADD]" a description of her job duties, but notes that she will be discussing her variable compensation with the Chief Commercial Officer, i.e. Laber. Rosales Decl. ¶3. Since January 17, 2020, nine other sales personnel in Laber's sales organization have quit Cutera to join Lutronic. Eckerman Decl. 29. On February 19, 2020, Lutronic hired another employee, bringing to 13 the number of Cutera hires since January 17, 2020. Rosales Decl. ¶4.

> **B.     Cutera Believes that Lutronic's Employees Misappropriated Cutera Trade Secrets While Still Employed with Cutera, As Well as While Employed By Lutronic; Lutronic's Employees Also Deleted Cutera Trade Secret Information And Destroyed Evidence Relevant To This Case**

While no discovery has occurred to date, Cutera's forensic expert, Lighthouse, has conducted a preliminary forensic analysis of the Former Cutera Employees' Cutera-owned laptops. Clarke Decl. ¶ 8. The search of Laber's laptop hard drive revealed that USB external storage devices were connected to the laptop on both January 17, 2020 and January 27, 2020, and Laber likely transferred individual files and folders from the laptop to the external devices on one or both of these occasions. *Id*. ¶ 10. **The forensic search also demonstrated that 116 GB of data had been deleted between January 19, 2020 and January 31, 2020, which could be the equivalent of more than *nine million printed pages*.** *Id*. The deleted data included local versions of iChat messages, specifically chats with other employees who resigned the same day as Laber, including Kim and Baker. *Id*. Laber's deletion activity was deliberate as his Google search history showed that January 27, 2020 (ten days after he quit Cutera and was supposed to have returned to his employer all of its property and documents) he actually studied how to delete certain information. His searches included: "*clear escents [sic] in excel*", "*cler [sic] imessage from mac*", "*remove all imessages from mac*" and "*delete recent document in office for*

*mac*." *Id*. These Google searches are consistent with the deletion activity observed on the laptop. *Id*.

Lighthouse's forensics also establishes that Laber synchronized several documents to an online iCloud account. *Id*. Examples of files include "Copy of sales demo June w pricing.xlsx.icloud", "Budget 2020 $[1] v1-22-20.xlsc.icloud", "Cutera NDA/. Cutera Customer NDA.docx.icloud", "TS3D Project/.Trusculpt financial model Marina.xlsx.icloud", "Secret RF Image/.NA DCMS_2017_Plan_FINAL_3.31.17.pdf.icloud," and "Old-Mail-ICLOUD/Inbox.mbox/.mbox.icloud." *Id*.

Lighthouse's examination of Yannocone's hard drive reveals that he connected a USB external storage device to the laptop on January 7, 2020, and approximately 20 folders containing 3.16 GB of data (approximately 262,000 printed pages) were copied to the device. *Id*. ¶ 11. Folders transferred to the device included the following titles: "2019 Price List & Commissions", "2019 rep info", "Coolsculpting accounts", "marketing", "pitches", "presentations", "region business plans", "top leads," which appear to be Cutera material. *Id*. Yannocone also deleted Cutera information from the laptop on January 27, 2020 (10 days after he quit), including documents entitled "Cutera Lasers Year End Discount" and "Greenway pitch." *Id*. The forensic analysis found that on January 25, 2020, various files on the laptop were accessed minutes before a generic USB flash drive was connected to the laptop, including files appearing to contain Cutera information, such as "jyannocone/Desktop/NA ASM_2015_Plan_FINAL_2.25.pdf" and "jyannocone/Desktop/NA ASM_TM_2017_Plan_FINAL_TEAM_NY_4.27.17.pdf." *Id*.

Lighthouse has determined that Kim connected a two terabyte "LaCie" USB external device to her laptop on January 27, 2020 (10 days after quitting). *Id*. ¶ 12. For reference, the internal hard drive of the computer is only 500GB, meaning the external hard drive Kim used has the capacity to store four times the volume of data that the laptop's drive is capable of storing. *Id*. The folder structure on the external device includes a folder entitled "E:\cutera\Jina PC,"

---

[1] This figure has been redacted for confidentiality purposes.

suggesting the folder contains all or substantially all of the contents of Kim's computer. *Id*. Another folder transferred to the external device is entitled "E:\cutera\Marketing" which, by its name, appears to be Cutera-related marketing. Kim (who reported to Laber) connected 16 external USB devices to her computer after November 1, 2019 (during which time Laber was negotiating with Lutronic). *Id*. The forensic search of her computer showed that an exfiltration, i.e. removal or copying, of data of at least 250 GB likely occurred via Cloud, removable media, and email (which is nearly 21 million printed pages of data). *Id*. There is evidence that a folder entitled "E:\cutera\Jina PC\outlook_archive" was exfiltrated via an external media device, suggesting that the contents of Kim's Cutera email archive was copied to an external device. *Id*. The search also uncovered significant cloud activity via Dropbox. *Id*. Files uploaded to a personal Dropbox account on January 17, 2020 (her last day, and date of her draft offer letter) include "C:/Users/jkim/Dropbox (Personal)/2020 Cutera NSM Short-v3.m4v ," "C:/Users/jkim/Dropbox (Personal)/cutera – marketing", "C:/Users/jkim/Dropbox (Personal)/cutera/NSM pics 2020". *Id*. The artifacts associated with these files indicate that this activity occurred between January 14, 2020 and January 17, 2020. *Id*. Finally, there is evidence of a mass deletion of files from the laptop on January 28, 2020. *Id*.[2]

The initial search on Baker's computer revealed that he connected several external media devices to the laptop, the most recent being a one TB LaCie external device last connected on January 19, 2020 (2 days after quitting). *Id*. ¶ 13. There is evidence of several files and folders created on the LaCie external device on January 17, 2020 that appear to be Cutera-related, including "D:\Competition", "D:\Pricing", "D:\Sales Bible", "D:\Trusculpt", "D:\WORKSHOP", and "D:\XEO." *Id*. Further, there is evidence of deletion of files as recently as January 18, 2020, including files such as, "C:\Users\jbaker\Desktop\Secret", "C:\Users\jbaker\Desktop\Trusculpt", "C:\Users\jbaker\Desktop\Advanced Sales.pptx" and "Copy of All truSculpt 3D and iD Customers.xlsx", "C:\Users\jbaker\Desktop\outstanding deals.xlsx", "Fwd Current

---

[2] Alarmingly and suspiciously, Kim's attorneys say that on January 31, she "lost" an external drive containing Cutera information while on a plane, without explaining why she had it with her 14 days after quitting. Rosales Decl. ¶11.

customers.msg", "2015.02.23 North America Price List.pdf ," "RSM Forecast Worksheet.xlsx", "Baker - Rep Forecast Hit List.xlsx." *Id.*[3]

In sum, the forensic search conclusively revealed that all laptops were accessed after the individuals resigned from employment with Cutera and that data on the laptops was manipulated, including, but not limited to, by being transferred off of the laptops and/or deleted from the laptops. *Id.* ¶ 15.

### C. Cutera Has Invested Significant Resources Developing Its Trade Secrets.

Cutera has invested substantial time, money and resources identifying, qualifying, and validating promising sales leads, designing specifications for prospective customers, formulating technical solutions to address its customers' needs, and developing and marketing its technology. Eckerman Decl. ¶9. Much of Cutera's success is related to its research and analysis of the market, resulting in significant amounts of trade-secret and proprietary information of incalculable value, and key to the success of its sales department. *Id.*

Cutera also invests substantial sums of money in the recruiting, hiring, training, and retaining of its employees, including its sales personnel. *Id.* The marketplace for trained and experienced sales people is very competitive, and Cutera therefore invests significant sums to attract and retain the best sales talent. *Id.* Cutera's contractual relationships with sales personnel represent a probable future economic benefit or advantage to Cutera. *Id.*[4]

---

[3] Forensic work is ongoing. Another Cutera employee that quit without notice on January 25, 2020, also sent Cutera information to her personal email account. Clarke Decl. ¶ 14.

[4] The Trade Secret Information Cutera has developed and possesses is set forth in significant detail in the Eckerman Declaration paragraph 10. It includes (1) confidential customer information; (2) employee information not available to the public or to its competitors, including the names, addresses, telephone numbers, qualifications, experience, sales track record, incentive compensation, compensation expectation, and other valuable information pertaining to these employees; (3) confidential sales reports containing detailed customer pricing information for specific customers, customer discounting information, and ordering information for Cutera products; (4) confidential market analysis and forecasting reports containing proprietary analyses of specific market trends, market pricing information trends, and target markets for selling Cutera products based on market conditions and financial analysis; (5) business analysis reports containing multi-year strategic plans, marketing plans, and projections for targeting and expansion of specific markets for selling Cutera products; (6) price and cost information, including current manufacturing and vendor costs, labor costs, overhead, profit margins, employee salaries, employee bonus and/or commissions information; and (7) product information, including product specifications and features, development plans, including for new

(continued...)

Cutera stores confidential information and trade secrets on its computer servers, and also maintains a database to manage sales contacts and data on www.salesforce.com. Eckerman Decl. ¶ 15. This database includes information regarding potential customer and current customer account and contact information including names, emails, addresses and phone numbers. *Id*. It also includes physician cell phone numbers which are extremely valuable for marketing campaigns and end-of-year promotions, as well as account contact history related to service and system deals and pricing. *Id*. The database also contains such information relating to each Cutera sales representative, including the employee's contact information. *Id*. The information that Cutera keeps on this database is highly confidential, proprietary, valuable, and key to the success of Cutera and its sales employees. *Id*.

Cutera's Trade Secret Information is not readily ascertainable or generally known to those who can obtain economic value from their disclosure or use (including Cutera's competitors or others in the industry). *Id*. at ¶11. The disclosure of this Trade Secret Information to Lutronic or any other competitor would permit that competitor to more effectively compete without having to incur the significant time, effort and expense incurred by Cutera, thus providing a significant market advantage for the Cutera competitor. *Id*. Cutera values and carefully safeguards its proprietary and trade secret information from disclosure to the general public and its competitors. *Id*. at ¶12. Indeed, Cutera has expended much effort to protect the secrecy of its trade secret information. *Id*.[5]

---

(...continued from previous page)
products, new product launch dates and schedules, pipelines, product reliability information, and roadmaps. *Id*. ¶ 10

[5] Cutera's efforts include the following: (1) having all new employees sign a confidentiality agreement in which they contractually promise to maintain Cutera's trade secret information; (2) requiring employees upon terminating their employment with Cutera, to deliver to Cutera (and not keep in their possession, recreate or deliver to anyone else) any and all Cutera documents and property, including Cutera's trade secret information.; (3) developing written and enforced Company policies regarding confidentiality; (4) receiving annual training to re-emphasize the importance of confidentiality; (5) restricting physical access to Company facilities; (6) restricting access to Company electronic information and data, including use of periodically changing passwords; (7) implementing a document destruction policy; (8) reminding employees, at the time of their termination of employment, of their contractual obligations to Cutera; and (9) taking all reasonable and necessary steps to legally safeguard Cutera's rights to its trade secret information. *Id*. ¶ 12.

(continued...)

### D. Cutera Entrusted the Former Cutera Employees With Trade Secrets and They Were Obligated to Protect Cutera's Trade Secret Information

Because of their positions and roles with Cutera, Laber, Yannocone, and Baker regularly accessed Cutera's salesforce database as a part of their employment duties. *Id*. ¶ 16. Moreover, each of the Former Cutera Employees had regular and extensive access to Cutera's confidential and proprietary trade secrets. As the information identified by Lighthouse reveals, they had access to not only technical information related to Cutera's medical aesthetic products, but non-public marketing and sales information, product roadmap and launch information, pricing information, and confidential information relating to Cutera's customers and sales employees. *Id*. Each had information relating to how Cutera divided up its sales territories for optimal sales results, how it compensated its sales personnel and managers, as well as Cutera's incentive compensation plans. *Id*. Cutera provided the Former Cutera Employees access to this Cutera Trade Secret Information expressly for use in the performance of their respective jobs in the Cutera sales organization. *Id*. As is customary in technology and medical device companies, each of the Former Cutera Employees signed a Confidentiality Agreement ("Agreement") pursuant to which the employees agreed to protect and keep confidential Cutera's trade secrets. Eckerman Decl. ¶ 14, Exh. C-F[6].

---

(...continued from previous page)
Cutera must maintain the strict confidentiality of its trade secrets to preserve its competitive advantage in the marketplace. *Id*.

[6] The Agreement provided that (i) during and after their employment they would protect, hold in strict confidence, and not use (except for Cutera's benefit) Cutera's Trade Secret Information, and (ii) upon terminating their employment with Cutera, they would deliver to Cutera (and would not keep in their possession, recreate or deliver to anyone else) any and all Cutera documents and property, including Cutera's Trade Secret Information. *Id*. ¶ 14. Laber, Baker and Yannocone also agreed that (iii) during the term of their employment with Cutera they would not engage in any other employment, occupation, consulting or other business activity directly related to the business in which Cutera was involved, and would not engage in any other activities that conflicted with their obligations to Cutera; (iv) they would sign and deliver to Cutera a "Termination Certification" confirming certain obligations to Cutera; and (v) for a period of 12 months, they would not use Cutera trade secrets to solicit Cutera's employees to leave their Cutera employment. *Id*. The Confidentiality Agreements further provided that the confidential information included, but was not limited to, information that related to the business of Cutera that was not generally known to the public, including information regarding Cutera's research, product plans, products, services, customer lists and customers, markets, software,
(continued...)

## III. ARGUMENT

To obtain preliminary injunctive relief, a party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in the favor of the moving party; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Stuhlbarg Int'l. Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (analysis for TROs and preliminary injunctions). An injunction can issue to "prevent any actual or threatened misappropriation" of a trade secret. 18 U.S.C. §1836(b)(3)(A).

### A. Cutera's Is Likely to Succeed on the Merits

Cutera is likely to convince the trier of fact that Lutronic and Former Cutera Employees have misappropriated or threaten to misappropriate Cutera's trade secrets for Lutronic's benefit. Misappropriation of a trade secret is defined as (a) "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means"; or (b) "disclosure or use of a trade secret of another without express or implied consent by a person who used improper means to acquire knowledge of the trade secret …." 18 U.S.C. § 1839(5). Information is considered a trade secret if it: (a) derives independent economic value, actual or potential, from not being generally known to another person who can obtain economic value from the disclosure or use of the information, and (b) its owner has made reasonable efforts to maintain its secrecy. 18 U.S.C. § 1839(3).

#### 1. Lutronic's Employees Have, or Threaten to, Misappropriate Cutera's Valuable Trade Secret Information

As set forth in detail above and in the declarations filed in support, Cutera's Trade Secret Information stored on its salesforce.com database includes information regarding potential customer and current customer account and contact information including names, emails, addresses, and phone numbers, physician cell phone numbers, and other highly confidential

---

(...continued from previous page)
developments, inventions, processes, technology, as well as financial or other business information. Eckerman Decl. Exhs. C-F.

information. Eckerman Decl. ¶ 15. This data is valuable to any competitor given the wealth of information relating to accounts and historical deals, including pricing. *Id*. Cutera has invested substantial time, money and resources identifying, qualifying, and validating promising sales leads, designing specifications for prospective customers, formulating technical solutions to address its customers' needs, and developing and marketing its technology. *Id*. ¶ 9.

The non-public customer, business and product information Cutera is seeking to protect derives independent economic value from not being generally known to the public. *Id*. ¶ 11. As discussed above, it includes pricing lists and information, budgets, product information and plans, customer information, marketing plans and information, business plans, discount information, sales plans, compensation information, and competition information. The disclosure to Lutronic of Cutera Trade Secret Information by the Former Cutera Employees would permit Lutronic to more effectively compete without having to incur the significant time, effort and expense incurred by Cutera, thus providing a significant market advantage. *Id*. [7]

Case law makes clear that they information at issue constitutes protectable trade secrets. *See Courtesy Temp. Serv., Inc. v. Camacho*, 222 Cal. App. 3d 1278, 1287-88 (1990) (customer lists and information, as well as negative research); *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1521 (1997) (same); *Silvaco Data Sys.s v. Intel Corp*. 184 Cal. App. 4th 210 (2010), disapproved on other grounds by *Kwikset Corp. v. Superior Court*, 51 Cal 4th 310 (2011) (customer preferences); *Morton v. Rank Am., Inc.*, 812 F. Supp. 1062, 1073-74 (C.D. Cal. 1993), (supplier lists, "negative" research, financial information, operational information, marketing strategies and methods, advertising and promotion information); *Whyte v. Schlage, Lock Co*., 101 Cal. App. 4th 1443 (2002) (pricing, profit margins, cost information, payment terms, marketing research, strategic plans, plans, and techniques, such as marketing concessions and promotional

---

[7] For example, if a competitor received Cutera's confidential pricing information, it could under-cut Cutera on pricing. *Id*. ¶ 16. If it combined this knowledge with confidential information on the companies that intended to purchase products in a specific time period, the competitor could unfairly accelerate its own sales progress, avoid substantial lead generation efforts, and under-cut Cutera on pricing in the sale. *Id*. Similarly, if a competitor became aware of potential sales leads without actually prospecting and working to develop those leads, it would put Cutera at a distinct disadvantage and it would likewise create a clear advantage for the competitor. *Id*.

discounts); *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 520-23 (9th Cir. 1993) (databases); *Hilderman v. Enea TekSci, Inc.*, 551 F. Supp. 2d 1183, 1202 (S.D. Cal. 2008) (pricing and employee lists, denying summary judgment motion because triable issue existed regarding use of trade secrets in solicitation of engineers); *Vacco Indus., Inc. v. Van Den Berg*, 5 Cal. App. 4th 34, 41-42, 50-51 (1992) (product plans and designs); *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 962 (C.D. Cal. 2011) (stating that concepts for unreleased products can merit trade secret protection).

### 2. The Forensic Evidence Shows the Former Cutera Employees Are Misappropriating Cutera's Trade Secrets or Threaten to Do So

While discovery has not even commenced, here there is a staggering amount of incriminating evidence showing that the Former Cutera Employees (now Lutronic's employees) have acted unlawfully and should not be trusted. They have unequivocally transferred and deleted data from Cutera's computers both shortly before and **after** leaving Cutera. They did so even after being told by Cutera's counsel not to access the computers or delete information Eckerman Decl. ¶ 17. Laber, for example, uploaded several Cutera documents to his iCloud account. Clarke Decl. ¶ 10. One document, entitled "NA ASM_TM_2019_Plan.pdf", is the 2019 Compensation plan for an ASM (Area Sales Manager) and TM (Territory Manager). Eckerman Decl. ¶19. This file contains the company's most recent fiscal year's compensation plan for its sales managers; such information is not in the public domain and Cutera, of course, does not want its competition to understand how it compensates, incentivizes, and retains its valuable sales talent. *Id*. Lutronic's access to this information puts Cutera at a disadvantage, as Lutronic can now model its future compensation plans off Cutera's plans to attract talent away from Cutera.[8] *Id*. Another document, entitled "Copy of Dec Level 5 Deals 1.13", contains highly confidential and valuable sales information, as Level 5 deals reflect the lowest level pricing the company would allow and require EVP Sales and President approval. *Id*. Yet another document, entitled "Q3 2019 Final 4", contains highly sensitive and proprietary business and financial information, as it appears to be a

---

[8] In fact, to date, in addition to the Former Cutera Employees, Laber and Lutronic have solicited and hired 10 other Cutera sales employees to leave Cutera and join Lutronic. *Id*.

third quarter financial update that provides information on Cutera's third quarter financial performance including budget, forecasts, regional performance, system performance, and consumable performance.[9] *Id*. There is also evidence that Laber uploaded a document entitled "Budget 2020 $__ v1-22-20.xlsc.icloud" (redacted) to his iCloud account. *Id*. The document appears to show Cutera's 2020 budget information; the details of Cutera's 2020 budget are extremely sensitive as they address sales and marketing spend, research and development spend, and by proxy, Cutera's corporate objectives. *Id*. If Lutronic has access to Cutera's 2020 operating expense budget, Lutronic would have knowledge of the financial impact of running the Cutera organization in 2020, including amounts spent on travel, benefits, demo expense, and sales meetings, etc. *Id*. Cutera's focus on our consumable business is critical to its future success. *Id*.

Though Laber was undoubtedly the ringleader of the efforts to steal Cutera's information, the other Former Cutera Employees also took pains to copy data from their Cutera-owned laptops and then cover their tracks. For example, Kim copied her entire computer onto a two terabyte USB external drive ten days after her last date of employment with Cutera. *Id*. ¶ 26. The forensic data also reveals evidence of a mass deletion of files from her Cutera-owned laptop 11 days after her last date of employment. *Id*. The forensic evidence demonstrates that Baker transferred several files to an external device on his last day of employment that are Cutera-related "D:\Competition", "D:\Pricing", "D:\Sales Bible", and "D:\Trusculpt." *Id*. ¶ 27. He also deleted files from his Cutera laptop after he resigned. *Id*. The forensic evidence shows that Yannoconne engaged in similar copying and deletion of data from his Cutera-owned laptop. *Id*. ¶¶ 22-25.

Lutronic and the Former Cutera Employees are not entitled to the benefit of their bad acts and all reasonable inferences should be made against them. It is undisputed that the Former Cutera Employees all had access to Cutera's Trade Secret Information while they were employed at Cutera, including information relating to Cutera's current and prospective customers and pricing.

---

[9] The quarter immediately preceding Laber's departure. *Id*.

Eckerman Decl. ¶ 16.  It is reasonable to infer that the Former Cutera Employees purposefully acquired Cutera's confidential information expressly for use in their new employment and attempted to delete information in order to avoid detection[10].  The files accessed, copied, and deleted contain the "keys" to much of Cutera's success and could be used by Lutronic to devastate Cutera's ability to compete in the global marketplace. *Id*. ¶ 28.

The forensic evidence also demonstrates that even while working for Cutera, Laber accessed *Lutronic* confidential information on Cutera's network on January 16, 2020 (Clarke Decl. ¶ 10), evidencing that he had already shifted his allegiance to Lutronic.  Because of Lutronic's failure to provide reasonable assurances to Cutera regarding the Lutronic's access to Cutera Trade Secret Information, it is reasonable to infer that Lutronic is acting in concert with the Former Cutera Employees to obtain and use Cutera's Trade Secret Information. Rosales Decl. ¶ 15.

Cutera has discovered the theft of its Trade Secret Information relatively early and there may still be time to prevent much of the damage if the Former Cutera Employees are ordered to return all the stolen files and ordered not to use, or disclose to third parties, the contents of the stolen files. Eckerman Decl. ¶ 18. Such an order will prevent Defendant from further damaging Cutera by profiting from the use of Cutera's confidential information and non-confidential proprietary information.

### B. Cutera Will Be Irreparably Harmed If An Injunction Does Not Issue

Here, Lutronic and the Former Cutera Employees are aggressively and blatantly misappropriating Cutera's trade secrets, including using that information to solicit and hire its employees, and to secure yet additional trade secrets impermissibly, all to Cutera's ongoing detriment. The files and information Lutronic's employees have stolen from Cutera detail substantial valuable and proprietary information, including information about compensation plans, important customer information, market plans, business plans, costs, pricing and other vital information. If used against Cutera, the effects could be devastating.  Injunctive relief is

---

[10] In fact, the forensic analysis demonstrated that on January 27, 2020 Laber searched Google for how to "remove all iMessagses from mac" and "delete recent document in office for mac." Clarke Decl. ¶10.

highly appropriate here precisely because Trade Secret Information is being misused by former Cutera employees with a current competitor, which unlawful conduct exposes Cutera to immeasurable damages and irreparable harm. *Imi-Tech Corp. v. Gagliani*, 691 F. Supp. 214, 231 (S.D. Cal. 1986) ("[i]rreparable injury is also shown by the evidence of Imi-Tech's investment of time and money in the development of the secret processes misappropriated by defendants . . . since harm to Imi-Tech's competitive position lacks any adequate remedy at law").

The Former Cutera Employees' misconduct has threatened market advantages that Cutera has expended substantial resources and efforts to create. It has lost at least 13 employees and potentially thousands of files and folders that Lutronic's employees have deleted and destroyed. Moreover, with access to the market and competitive product information being critical to a market advantage, every day that Lutronic and the Former Cutera Employees are permitted to continue possessing and utilizing Cutera's trade secrets results in increasing but unascertainable harm to Cutera. Thus, the irrefutable evidence shows that the Former Cutera Employees' retention and use of Cutera's trade secret information constitutes immediate, irreparable harm to Cutera, warranting immediate injunctive relief.

In view of the Former Cutera Employees' deceptive practices of stealing tens-of-thousands of computer files and transferring them amongst highly mobile personal USB devices, it is highly likely the Former Cutera Employees will conceal the stolen computer files unless this Court grants this motion and allows Cutera's forensic expert to copy data from the Former Cutera Employees' computers and USB devices. This may be Cutera's only opportunity to obtain this information. Cutera is simply seeking to preserve evidence and to prevent dissemination of its confidential and proprietary information.

**C.     The Balance of Equities Tips In Cutera's Favor.**

As discussed above, Cutera will suffer immediate and irreparable injury if this application is not granted. An injunction will not prevent Lutronic from continuing to employ the Former Cutera Employees indefinitely or cease from conducting business. Rather, it will only ensure that Defendant obeys the law and ceases the wrongful acts identified above. Regardless, Lutronic's employees have brought these consequences on Lutronic by their egregious conduct. If an

injunction is not issued however, Cutera's competitive position risks being undermined. Indeed, courts have consistently held that **immediate injunctive relief is necessary to prevent irreparable injury to a plaintiff whose former employees have misappropriated their trade secrets because damages alone cannot provide an adequate remedy**. *See, e.g.*, *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (noting that the loss of a trade secret cannot be measured by money damages). In sum, the irreparable harm to Cutera absent an injunction clearly outweighs any harm to Defendant.

### D. An Injunction Is In The Public Interest.

The public interest analysis requires the court consider "whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed. Cir. 1988). "When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be 'at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary injunction.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138-39 (9th Cir. 2009) (*quoting Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003)).

Here, the impact of granting a temporary restraining order is limited to the parties and the key Former Cutera Employees. The general public does not have any significant interest as there is no indication that the impact will reach beyond the parties and injure the public in any fashion. To the extent the public has any interest in this matter, the public interest favors a temporary restraining order as laws forbidding trade secret misappropriation must be respected and enforced. Accordingly, this factor also supports the granting of a temporary restraining order.

### E. An Order Is Required To Prevent The Destruction Of Essential Evidence.

Cutera respectfully suggests that an evidence preservation order is needed to preserve the status quo and to provide Cutera with a full opportunity to reveal the full extent of Defendant's illegal actions. The preservation (and ultimately search of) all computers and other electronic storage devices, emails, and other data (electronic or otherwise) is essential. Cutera requests that an Order that all evidence relating to Defendant's misconduct be preserved.

## IV. CONCLUSION

For the foregoing reasons, the Court should grant Cutera's application for a temporary restraining order and order to preserve evidence.

Dated: February 20, 2020

WILSON SONSINI GOODRICH & ROSATI  
Professional Corporation

By: /s/ Ulrico S. Rosales  
Ulrico S. Rosales  
Meaghan Snyder

Attorneys for Plaintiff  
CUTERA, INC.