1
2
3
4
5
6
7
8                     UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CUTERA, INC.,                          No. 2:20-cv-00235-KJM-DB

12                  Plaintiff,

13          v.                              ORDER

14   LUTRONIC AESTHETICS, INC., et al.,

15                  Defendants.

16

17          Plaintiff Cutera, Inc. sues a competitor, defendant Lutronic Aesthetics, Inc.

18   ("Lutronic"), for misappropriation of Cutera's trade secrets through Lutronic's hiring of several

19   former Cutera employees.  Cutera moves for a temporary restraining order barring defendants'

20   continued misappropriation of those secrets and seeks an order preserving related evidence.  After

21   hearing oral argument from both parties on March 4, 2020, and for the reasons discussed below,

22   the court GRANTS Cutera's motion in part.

23   I.     BACKGROUND

24          A.     Factual Background

25          Cutera and Lutronic are both medical device companies that market and sell laser

26   systems and other products for use in the medical aesthetics industry.  Eckerman Decl. ¶¶ 2, 8–9,

27   ECF No. 12-3.  The two companies are direct competitors.  *Id.* ¶ 8.

28   /////

In January 2020, four Cutera employees involved in marketing and sales, Larry Laber, Jonathan Baker, John Yannocone and Jina Kim (together the "Former Cutera Employees"), suddenly resigned from Cutera and began working for Lutronic soon afterwards. *Id.* ¶¶ 3–8. Nearly a year earlier, in February 2019, Laber, at the time Executive Vice President of Sales at Cutera, began communicating with Lutronic while still employed with Cutera. Clarke Decl. ¶ 10, ECF No. 12-4. Laber resigned his Cutera employment on January 17, 2020, to work for Lutronic. Eckerman Decl. ¶ 3. The other Former Cutera Employees— Baker, Yannocone and Kim—quit Cutera the same day. *Id.* Between January 17, 2020, and February 20, 2020, nine other sales personnel left Cutera to join Lutronic, increasing the number of former Cutera employees working there to thirteen. *Id.* ¶ 29.

Before filing the instant motion, Cutera engaged a forensic expert, Lighthouse, to conduct a "forensic analysis of the Former Cutera Employees' Cutera-owned laptops." Mot. for Temporary Restraining Order ("TRO"), ECF No. 12, at 6 (citing Clarke Decl. ¶ 8). It is evident from this analysis that, while the Former Cutera Employees eventually returned their Cutera laptops to Cutera, they did not do so immediately after terminating employment. *See generally* Clarke Decl.; *see also* Rosales Decl. Ex. C, ECF No. 12-2, at 17 (email from plaintiff's counsel alleging the Former Cutera Employees "accessed their Cutera computers before returning them"). The analysis of Laber's laptop hard drive showed external storage devices were connected to the laptop on January 17, 2020 and January 27, 2020, but "artifacts typically used to determine what files or folders were transferred had been deleted or otherwise cleared," making it "not possible" to know what, if anything, was transferred from the laptop without inspection of the external storage devices themselves, which have not been provided to Cutera. Clarke Decl. ¶ 10. Lighthouse was able to determine that the user of Laber's laptop synchronized several documents to an online iCloud account, possibly as recently as January 27, 2020, including files titled "Copy of Dec Level 5 Deals 1.13.xlsx," "Cutera 2015 Product Pricing Matrix 9 19 14 w Candela.xlsx," "Cutera 2015 Product Pricing Matrix 9 19 14.xlsx," "NA ASM TM 2019 Plan.pdf," "Copy of sales demo June wpricing.xlsx.icloud" and "Budget 2020 $' v1-22-20.xlsc.icloud." *Id.*

/////

2

The analysis also shows 116 gigabytes of data were deleted from Laber's laptop on or around January 27, 2020. *Id.* A review of Laber's Google search history shows he searched "clear escents [sic] in excel," "cler [sic] imessage from mac," "remove all imessages from mac" and "delete recent document in office for mac." *Id.*

Lighthouse's analysis of Yannacone's hard drive revealed that, ten days before Yannacone resigned from Cutera, the user of his laptop copied approximately 20 folders containing 3.16 gigabytes of data from the laptop to an external drive, including folders titled: "2019 Price List & Commissions," "2019 rep info," "Coolsculpting accounts," "marketing," "pitches," "presentations," "region business plans" and "top leads." *Id.* ¶ 11. The analysis also suggested a second external drive was connected on January 25, 2020, and several other files were accessed minutes before it was connected, *id*; however, counsel for the Cutera Former Employees has apparently refused Cutera's requests to produce these external hard drives for further forensic analysis, Rosales Decl. ¶¶ 5–8. Finally, Lighthouse's analysis revealed a folder entitled "personal" was deleted from Yannacone's laptop after being transferred to the external drive; that folder included documents entitled "Cutera Lasers Year End Discount" and "Greenway pitch." Clarke Decl. ¶ 11.

Lighthouse's analysis of the other two Former Cutera Employees' laptops, as well as one additional former employee's laptop, produced similar results indicating the users copied over material potentially containing trade secrets to an external drive, iCloud account, Dropbox account or emailed them externally, and deleted certain contents of the Cutera laptops, just prior to or soon after they left Cutera. *Id.* ¶ 12 (results of forensic analysis of Kim's laptop suggesting folders transferred to external device including "E:\cutera\Marketing"); *id.* ¶ 13 (results of forensic analysis of Baker's laptop revealing folders transferred to external device including "D:\Competition", "D:\Pricing", "D:\Sales Bible"); *id.* ¶ 14 (results of forensic analysis of Lauren D'Olympio's laptop, who also left Cutera for a job at Lutronic, suggesting D'Olympio emailed the attachment "Cutera Suggested Pricing.doc." to her personal email on January 17, 2020). "In sum, the forensic search conclusively revealed that all laptops were accessed after the individuals resigned from employment with Cutera and that data on the laptops was manipulated, including,

but not limited to, by being transferred off of the laptops and/or deleted from the laptops." TRO at 9 (citing Clarke Decl. ¶ 15).

Additionally, on March 1, 2020, after Cutera filed its TRO motion but before hearing, a current Cutera employee was included on an email chain, apparently inadvertently, between Lutronic employees and Former Cutera Employees who work at Lutronic, as well as Yannocone and Baker. In the email chain, one Lutronic employee wrote, "I also LOVED how the aesthetic triangle was presented. . . Great job Lexi and Jim!!! That can be used as a tool in so many ways!" Suppl. Eckerman Decl. ¶ 4, ECF No. 19. Cutera offers evidence suggesting the "Aesthetic Triangle" is a method of conducting sales pitches to physicians that was developed by Cutera and kept confidential. *Id.* ¶ 5. After Cutera filed this supplemental evidence, Lutronic filed a declaration in opposition, offering its own evidence to suggest the "Aesthetic Triangle" method is publicly known. Foggo Decl. ¶ 5, ECF No. 21-2.

B. Procedural Background

On January 31, 2020, Cutera filed its complaint against Lutronic asserting the following claims: (1) misappropriation of trade secrets in violation of the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code §§ 3426, *et seq.*; (2) misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836; (3) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961(4); (4) tortious interference with contractual relations; (5) tortious interference with prospective economic advantage; (6) unfair competition; and (7) aiding and abetting. Compl., ECF No. 1. On February 10, 2020, Lutronic filed both a motion to dismiss and a motion to transfer venue to the Northern District of California. ECF Nos. 4, 5. Those motions are scheduled to be heard on April 24, 2020.

On February 20, 2020, Cutera filed the present motion for temporary restraining order. Mot. for TRO ("TRO"), ECF No. 12-1. Lutronic opposed the motion, Opp'n, ECF No. 15, and the court promptly set the matter for hearing, entertaining oral argument on March 4, 2020.

/////

4

A day after filing here, on February 21, 2020, Cutera sought a temporary restraining order against the Former Cutera Employees in state court, which was denied. Opp'n at 6 (citing Finberg Decl. ¶ 9, ECF No. 15-1). As Cutera's counsel explained at hearing, it pursued the action in state court given that three of the four Former Cutera Employees had signed agreements with Cutera providing for venue there. The company is currently in arbitration with three of the four Former Cutera Employees, *id.* at 6 n.1 (citing Finberg Decl. ¶ 2), with the possibility the state action will proceed only against Ms. Kim.

For the reasons below, the court GRANTS in part Cutera's request for a temporary restraining order and an evidence preservation order.

II.     LEGAL STANDARD

A temporary restraining order may be issued upon a showing "that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). The purpose of such an order is to preserve the status quo and to prevent irreparable harm "just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 439 (1974). In determining whether to issue a temporary restraining order, a court applies the factors that guide the evaluation of a request for preliminary injunctive relief: whether the moving party "is likely to succeed on the merits, . . . likely to suffer irreparable harm in the absence of preliminary relief, . . . the balance of equities tips in [its] favor, and . . . an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted); *see also Stuhlbarg Int'l. Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (analysis for temporary restraining orders and preliminary injunctions "substantially identical").

III.     DISCUSSION

As explained at hearing, the court finds Cutera's motion for a temporary restraining order ("TRO") was not unduly delayed, given its reasonable position that it needed to conduct a forensic analysis to obtain the information that now supports its motion. *See* Opp'n at /////

10–13 (arguing the court should deny the motion as unduly delayed).  The court therefore proceeds to analyze the merits of the motion.

  A. Likelihood of Success on the Merits

  The court focuses on the likelihood of success of Cutera's claims under California and federal trade secrets law.  *See Engility Corp. v. Daniels*, 16-CV-2473-WJM-MEH, 2016 WL 7034976, at *8 (D. Colo. Dec. 2, 2016) (analyzing only certain claims from complaint in preliminary injunction analysis based on content of plaintiff's preliminary injunction request).

  1. Existence of Trade Secrets

  "California has adopted the Uniform Trade Secrets Act ("UTSA"), which codifies the basic principles of common law trade secret protection."  *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520 (9th Cir. 1993) (citing Cal. Civ. Code §§ 3426–3426.10 ("CUTSA")).  To establish a violation of the CUTSA, a plaintiff must show (1) the existence of a trade secret, and (2) misappropriation of the trade secret."  *AccuImage Diagnostics Corp v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 950 (N.D. Cal. 2003).

  A "trade secret" is "information, including a formula, pattern, compilation, . . . or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public . . . , and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Cal. Civ. Code § 3426.1(d).  In other words, the information "is valuable because it is unknown to others" and "the owner has attempted to keep [it] secret."  *DVD Copy Control Assn. v. Bunner*, 116 Cal. App. 4th 241, 251 (2004).

  The CUTSA defines "misappropriation" as, *inter alia*, the acquisition of a trade secret by "improper means," which includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy."  Cal. Civ. Code § 3426.1(a), (b)(1).  "Misappropriation" also means disclosure or use of a trade secret without the owner's consent.  *Id.* § 3426.1(b)(2).  "Use" includes soliciting customers through the use of trade secret information.  *PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1383 (2000).

  At the federal level, Congress recently enacted the Defend Trade Secrets Act to "provide Federal jurisdiction for the theft of trade secrets."  *See* DTSA of 2016, Pub. L. No. 114-

153, 130 Stat. 376 (DTSA) (codified in scattered sections of title 18 of the United States Code). Similar to the CUTSA, the DTSA permits the "owner of a trade secret that is misappropriated" to bring a civil action, 18 U.S.C. § 1836(b), and includes substantially similar definitions of "trade secret" and "misappropriation." *See* 18 U.S.C. § 1839(3), (5).  The parties do not assert any material difference between the CUTSA and the DTSA.

Cutera identifies the following information as trade secrets that are contained in the files allegedly copied and retained by the Former Employees, which the court refers to here broadly as the "Cutera Trade Secret Information":

- Cutera's confidential customer contract information, including current and prospective customer names and contact information compiled through internal research, sales lead and call information and records, confidential information related to undisclosed pricing, historical quote history, discount information, payment terms offered to customers or potential customers, reasons for changes to quotes, analyses of customer demands, preferences, feedback and needs, previous discussions with customers, regarding prior and potential new projects, and proposed technical engineering specifications stored on Cutera computers, servers, information related to product reliability and warranty information, and Cutera's salesforce.com database ("Customer Information");

- Cutera employee information not available to the public or to its competitors, including the names, addresses, telephone numbers, qualifications, experience, sales track record, incentive compensation, compensation expectation, and other valuable information pertaining to these employees ("Employee Information");

- Cutera's confidential sales reports containing detailed customer pricing information for specific customers, customer discounting information, and ordering information for Cutera products ("Sales Information");

- Cutera's confidential market analysis and forecasting reports containing proprietary analyses of specific market trends, market pricing information

7

trends, and target markets for selling Cutera products based on market

conditions and financial analysis ("Market Information");

- Cutera business analysis reports containing multi-year strategic plans,

  marketing plans, and projections for targeting and expansion of specific

  markets for selling Cutera products ("Business Information");

- Cutera price and cost information, including current manufacturing and vendor

  costs, labor costs, overhead, profit margins, employee salaries, employee

  bonus and/or commissions information ("Pricing Information"); and

- Cutera product information, including product specifications and features,

  development plans, including for new products, new product launch dates and

  schedules, pipelines, product reliability information, and roadmaps ("Product

  Information").

Eckerman Decl. ¶ 10; Compl. ¶ 18.

For the purposes of this motion, the court is satisfied that at least some of the

Cutera Trade Secret Information consists of sufficiently identified compilations of information

that "derive[] independent economic value, actual or potential, from not being generally known to

the public." Cal. Civ. Code § 3426.1(d)(1); *see Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp.

2d 1079, 1089 (E.D. Cal. 2012) (finding, although publicly available customer identity and

contact information by itself may not be a trade secret, plaintiff's "comprehensive, if not

encyclopedic, compilation of customer, operator, and vendor information" was likely protectable

trade secret).

The Customer Information, for example, is likely a protectable trade secret, if

properly protected as discussed below. "Under the California [CUTSA], Cal. Civ. Code § 3426,

*et seq.*, a customer list may constitute a protected trade secret if it includes nonpublic information

that provides a 'substantial business advantage' to competitors." *Pollara v. Radiant Logistics,*

*Inc.*, 650 F. App'x 372, 373 (9th Cir. 2016) (quoting *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514

(1997)). "As a general principle, the more difficult information is to obtain, and the more time

and resources expended by an employer in gathering it, the more likely a court will find such

1  information constitutes a trade secret." *Morlife, Inc.*, 56 Cal. App. 4th at 1522 (citation omitted).

2  For the purpose of this motion, Cutera has offered sufficient evidence to show it has spent

3  significant time and resources developing the Customer Information, the information would give

4  a competitor a substantial business advantage and the information is not readily ascertainable.

5  Eckerman Decl. ¶¶ 9, 11, 15.

6         For the same reasons, the Pricing Information is also likely a protectable trade

7  secret. *See Argo Grp. US, Inc. v. Prof'l Governmental Underwriters, Inc.*, No. SACV 13-1787

8  AG (DFMx), 2013 WL 11327772, at *2 (C.D. Cal. Dec. 6, 2013) ("[I]nformation regarding profit

9  margins, costs, and market research can be protected trade secrets." (citing *Whyte v. Schlage Lock*

10  *Co.*, 101 Cal. App. 4th 1443, 1456 (2002)); Eckerman Decl. ¶¶ 9, 11.

11         The court also finds the Cutera Trade Secret Information was likely "the subject of

12  efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code

13  § 3426.1(d); *Pyro Spectaculars*, 861 F. Supp. 2d at 1092 (finding, although plaintiff's "security

14  practices are not perfect," issues could be further explored in discovery and at trial, and plaintiff's

15  efforts were sufficiently reasonable to support preliminary injunction). Cutera requires

16  employees to sign confidentiality agreements that require employees to keep information

17  including "customer lists" and "marketing, financial or other business information disclosed . . .

18  by the company" confidential. Eckerman Decl., Exs. C–F (Former Cutera Employees'

19  confidentiality agreements)); *see also MAI Systems*, 991 F.2d at 521 (confidentiality agreement

20  supported "reasonable efforts"). The employee handbook requires employees to maintain the

21  confidentiality of, *inter alia*, Cutera's "strategy, customers, . . . [and] financial information," and

22  Cutera provides employees with access to confidential information on a "need to know" basis.

23  Eckerman Decl., Ex. B at 27 (Cutera Employee Handbook)). This is sufficient to show Cutera

24  made reasonable efforts to maintain the secrecy of the Cutera Trade Secret information, and that

25  at least some of that information is not available publicly.

26         In sum, Cutera will likely succeed in showing at least some of the Cutera Trade

27  Secret Information "derives independent economic value" and is subject to "reasonable efforts" to

28  /////

protect its secrecy, Cal. Civ. Code § 3426.1(d).  Cutera has sufficiently shown, as a threshold

matter, its trade secrets exist so as to support its motion here.

## 2.   Misappropriation

The CUTSA defines misappropriation as including the "[a]cquisition of a trade

secret of another by a person who knows or has reason to know that the trade secret was acquired

by improper means" and the "use of a trade secret of another without express or implied consent

by a person who [] [u]sed improper means to acquire knowledge of the trade secret."  Cal. Civ.

Code § 3426.1(b).  Misappropriation under the DTSA is identical to that under the CUTSA in this

respect.  *See* 18 U.S.C § 1839(5).

As described above, the declaration of Cutera's forensic examiner strongly

suggests some of the Cutera Trade Secret Information was taken by the Former Cutera

Employees near the time they joined Lutronic, given that large blocks of data containing

categories of the information were saved from Cutera laptops onto external devices, in many

instances after a former employee had already begun working for Lutronic.  *See* Clarke Decl.  It is

reasonable to infer from this evidence that the Former Cutera Employees possessed the

documents and folders containing this information when they became employees of Lutronic or

shortly thereafter, at which point they had become agents of Lutronic to the extent they were

acting within the scope of their employment.  The court recognizes that "[m]ere possession of

trade secrets by a departing employee" is not sufficient to establish misappropriation or show

injury.  *Norsat Int'l, Inc. v. B.I.P. Corp.*, No. 12CV674-WQH-NLS, 2014 WL 2453034, at *6

(S.D. Cal. May 30, 2014) (*FLIR Sys., Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1279 (2009)).

However, the evidence indicating the Former Cutera Employees copied files and folders such as

those entitled "top leads," "2019 Price List & Commissions," "E:\cutera\Marketing," and

"D:\Sales Bible," Clarke Decl. ¶¶ 10–13, at the time of their departure or within a short time

thereafter strongly suggests they intended to use the information in their employment with

Lutronic.  As plaintiff's counsel pointedly asks, why else would they have copied this information

in particular?  The evidence of copying, paired with the evidence that Lutronic employees have,

in fact, deployed a sales method claimed by Cutera as a trade secret, to at least one rave review by

10

another Lutronic employee, *see* Suppl. Eckerman Decl., Ex. A (email thread), leads the court to conclude that at this early stage Cutera has shown a likelihood of success on the misappropriation element of its trade secrets claim.

  B. <u>Irreparable Harm</u>

   The court turns to whether denying a preliminary injunction against Lutronic would cause Cutera "irreparable harm." *Winter*, 555 U.S. at 20. "An irreparable harm is one that cannot be redressed by a legal or equitable remedy following trial." *Optinrealbig.com, LLC v. Ironport Sys., Inc.*, 323 F. Supp. 2d 1037, 1050 (N.D. Cal. 2004) (citing *Public Util. Comm'n v. FERC*, 814 F.2d 560, 562 (9th Cir. 1987)). Ordinarily, economic injury is not irreparable because monetary damages are an adequate remedy. *Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). However, "intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm." *Id.*; *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (evidence of threatened loss of prospective customers or goodwill supports irreparable harm finding). Although "loss of control over business reputation and damage to goodwill could constitute irreparable harm," a court's finding of such harm cannot be "grounded in platitudes rather than evidence." *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013). A plaintiff must "demonstrate a likelihood of irreparable injury—not just a possibility—in order to obtain preliminary relief." *Winter*, 555 U.S. at 21.

   Although establishing a likelihood of success in one type of intellectual property case, namely a trademark infringement action, once created a presumption that the party seeking a preliminary injunction would suffer irreparable harm, *see, Herb Reed Enterprises, LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013), recent Ninth Circuit cases have called into question whether this presumption is consistent with the Supreme Court's decision in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 394 (2006). *See 7-Eleven, Inc. v. Dhaliwal*, No. 12-CV-02276-KJM-GGH, 2012 WL 5880462, at *6–7 (E.D. Cal. Nov. 21, 2012) (discussing issue of irreparable harm presumption) (citing *eBay Inc., LLC*, 547 U.S. at 394; *Marlyn Nutraceuticals,*

/////

*Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 877 (9th Cir. 2009); *Flexible Lifeline Sys.,*
*Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir. 2011)).

While the Ninth Circuit has yet to directly address the impact of *eBay* on courts'
power to presume irreparable harm in trade secrets cases, in particular, this court joins those
district courts who have declined to rely on a presumption in determining irreparable harm in the
intellectual property context. *See, e.g.*, *V'Guara Inc. v. Dec*, 925 F. Supp. 2d 1120, 1126 (D.
Nev. 2013) (citing *Flexible Lifeline Systems* in declining to presume irreparable harm for a trade
secret claim); *but see Comet Techs. United States of Am. Inc. v. Beuerman*, No. 18-CV-01441-
LHK, 2018 WL 1990226, at *5 (N.D. Cal. Mar. 15, 2018) (citing pre-*Flexible Lifeline Systems*
district court decisions for the proposition that courts in this district presume plaintiff will suffer
irreparable harm if proprietary information is misappropriated).

Even without relying on the presumption, the court finds Cutera has met its burden
of showing a likelihood of irreparable harm here for two reasons. First, Cutera has submitted
some evidence, without formal discovery, that Lutronic already has used at least some of the
Cutera Information to Lutronic's apparent advantage. The email chain between Lutronic
employees who are not Cutera alumni and certain Former Cutera Employees now working for
Lutronic strongly suggests Lutronic has used Cutera proprietary information misappropriated by
the Former Cutera Employees. Suppl. Eckerman Decl., Ex. A (email thread). Cutera also offers
evidence suggesting the "Aesthetic Triangle" method developed by Cutera is valuable and
protected. Suppl. Eckerman Decl. ¶ 5. Though Lutronic offers contrary evidence suggesting the
"Aesthetic Triangle" method is publicly available, Lutronic has not provided a side-by-side
comparison of the method it says is publicly available and the method being used by Lutronic
employees after January 17, 2020. *See* Finberg Decl. ¶¶ 7–9; Foggo Decl. Moreover, the
excitement registered by at least one Lutronic employee upon learning of the method signals that
it is new and valuable to Lutronic. *See* At this stage of the action, on this record, the court finds
plaintiff has shown a likelihood that the information is proprietary. Suppl. Eckerman Decl., Ex.
A (email thread). The evidence of use and Lutronic's litigation response suggests Cutera will
continue to use the information without an injunction, and as a result, Cutera will suffer

competitive harm.  *See Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2017 WL 2123560, at *11 (N.D. Cal. May 15, 2017) (noting irreparable harm likely where "it may prove impossible to fully restore the parties to their respective competitive positions as if no misappropriation had occurred").

Second, as noted, Cutera has offered evidence to show the Former Cutera Employees deliberately transferred a large quantity of electronic information embodying Cutera documents and folders from their Cutera laptops to external drives either right before or shortly after leaving the company for a direct competitor.  *See generally* Clarke Decl.  Moreover, there is evidence showing at least one of the Former Cutera Employees, Mr. Laber, was in communication with Lutronic representatives for several months prior to leaving Cutera, and, on the day he left Cutera, copied files containing likely trade secret information off of the Cutera laptop he was assigned while working for Cutera.  *See* TRO at 5–6 (citing Clarke Decl. ¶ 10). Furthermore, the evidence suggests a second Former Cutera Employee, Yannacone, transferred folders likely containing trade secret information off of his Cutera laptop ten days prior to leaving the company for Lutronic.  *Id.* at 7 (citing Clarke Decl. ¶ 11).  All of this evidence gives rise to a reasonable inference that the Former Cutera Employees intended to use this information to benefit their new employer.  *See Waymo*, 2017 WL 2123560, at *11 (finding irreparable harm in part because employee remained in possession of "over 14,000 confidential files" from former employer and "[m]isuse of that treasure trove remains an ever-present danger wholly at his whim").  This information, paired with the email chain described above, supports the court's finding there is a likelihood Lutronic is using or will use the Cutera Information to its competitive benefit, and to Cutera's competitive harm.

Together, this evidence shows Cutera will likely suffer irreparable harm without a TRO.

C.      Balance of Equities

The balance of equities also tip in Cutera's favor.  *See Winter*, 555 U.S. at 20.   An injunction will prevent Lutronic from using any misappropriated information and thereby minimize the competitive harm suffered by Cutera as a result.  By  preventing Lutronic from

using any Cutera Trade Secrets Information, a narrowly tailored injunction will merely prevent

Lutronic from engaging in unlawful acts, which it claims to be avoiding in any event. *See Sierra*

*Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009) ("When deciding whether to issue a

narrowly tailored injunction, district courts must assess the harms pertaining to injunctive relief in

the context of that narrow injunction."). The court acknowledges Lutronic's suggestion at

hearing that Cutera will likely publicize any injunction order in such a way as to hurt Lutronic's

market standing, although the argument is not supported by any evidence quantifying that

potential harm. At this stage and on this record, the risk of competitive harm to Cutera from

Lutronic's use of the Cutera Trade Secrets Information to Cutera outweighs any speculative risk

to Lutronic. As such, the balance of equities tips in Cutera's favor.

> D.  Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard

for the public consequences in employing the extraordinary remedy of injunction." *Winter*,

555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). Trade secret

cases involving former employees traditionally involve two competing public interests:

> On the one hand, California has a "settled legislative policy in favor
> of open competition and employee mobility," protecting "the
> important legal right of persons to engage in businesses and
> occupations of their choosing." *Edwards v. Arthur Andersen LLP*,
> 44 Cal. 4th 937, 946 (2008). On the other hand, the state also has a
> strong policy in favor of protecting trade secrets. *Retirement Group
> v. Galante*, 176 Cal. App. 4th 1226, 1237 (2009) ("An equally
> lengthy line of cases has consistently held former employees may not
> misappropriate the former employer's trade secrets to unfairly
> compete with the former employer").

*Pyro Spectaculars*, 861 F. Supp. 2d at 1092; *see also Morlife*, 56 Cal. App. 4th at 1520.

Here, the court declines to issue the broad injunction requested by plaintiff, which

would prevent Lutronic from directing the Former Cutera Employees to perform their current

duties. In this way, the court will avoid undermining the public interest in promoting the mobility

of employees, subject to lawful restrictions including the protection of trade secrets. Because the

court finds Cutera has shown a likelihood of success on the merits of its trade secrets claims, a

likelihood of irreparable harm if an injunction is not granted, and the balance of equities tips in

Cutera's favor, it follows that the public's interest in these circumstances favors an injunction "specifically focused" on Lutronic's use of any misappropriated trade secrets. *See Pyro Spectaculars*, 861 F. Supp. 2d at 1093 (finding public interest supported injunction "specifically focused on preventing misuse of PSI's trade secrets to solicit PSI's customers" where plaintiff satisfied the three other preliminary injunction requirements).

IV.     PROPRIETY OF A BOND

Federal Rule of Civil Procedure 65(c) provides in relevant part that "[t]he court may issue a . . . temporary restraining order only if the movant gives security in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  A district court retains discretion "as to the amount of security required, *if any*." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation marks and citations omitted) (emphasis in original).  The court may dispense with the filing of a bond if "there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003).  The bond's purpose is to safeguard a defendant if the court later determines a defendant has been wrongfully enjoined. *Moroccanoil, Inc. v. Zotos Intl., Inc.*, CV 16-7004 DMG (AGRx), 2017 WL 319309, at *10 (C.D. Cal. Jan. 19, 2017) (setting bond at $250,000 based on "tangible costs" defendant would incur due to injunction but not costs it could later recoup or speculative lost profits).

At hearing, Lutronic argued a three-million-dollar bond is required here because it expects Cutera will publicize the court's  temporary restraining order in such a way as to hurt Lutronic's standing in the market.  As noted, Lutronic has not submitted any evidence to this effect.   Lutronic's  evidence, which the court has reviewed *in camera* subject to a pending request to seal, ECF No. 20, relates only to the harm Lutronic would suffer if certain portions of the requested TRO are granted.  Because the court declines to grant those portions of the TRO, the court DENIES the sealing request as MOOT.  In sum, the court is left with little to no evidence to evaluate what harm Lutronic would suffer from the narrow injunction the court grants here.  Therefore, the court finds no "tangible costs" Lutronic would incur to justify such a

/////

sizeable request. *Moroccanoil*, 2017 WL 319309, at *10. This finding does not prevent Lutronic from renewing its request for a bond at the preliminary injunction stage, if necessary.

The court in its discretion nonetheless sets an amount of security, finding some amount is necessary to signal that Cutera will be required to cover Lutronic's costs if Lutronic is wrongfully enjoined. At hearing, Cutera suggested a bond be set at $5,000 if it is necessary. Because Lutronic has provided no reason to require more, the court sets the bond amount at $5,000, which is sufficient in these circumstances, especially given the short duration of a TRO.

V.     REQUEST FOR AN EVIDENCE PRESERVATION ORDER

As part of its request for a TRO, Cutera also requests the court issue an evidence preservation order against Lutronic, arguing that, absent such an order, the Former Cutera Employees will likely continue deleting evidence relevant to Cutera's trade secrets claims. This argument is primarily based on the evidence suggesting the Former Cutera Employees have already deleted many files containing Cutera information off of the laptops Cutera had issued them at about the same time they left the company for Lutronic. *See generally* Clarke Decl.

An order requiring the preservation of evidence may be appropriate considering (1) concerns "for the continuing existence and maintenance of the integrity of the evidence in question"; (2) "any irreparable harm likely to result to the party seeking the preservation of the evidence;" and (3) "the capability of an individual, entity, or party to maintain the evidence sought to be preserved." *Jardin v. Datallegro, Inc.*, No. 08–1462I, 2008 WL 4104473, at *1 (S.D. Cal. Sept. 3, 2008) (citation omitted).

As to the first factor, defendants argue an evidence preservation order is unnecessary, as the company has already instituted a standard litigation hold. Opp'n at 17 (citing Finberg Decl. ¶ 6). Nonetheless, the court finds the evidence suggesting the Former Cutera Employees, who are now agents of Lutronic in the course of their work there, deleted large amounts of potentially relevant data from their laptops raises legitimate concerns for the "continuing existence and maintenance of the integrity of the evidence in question." *Jardin*, 2008 WL 4104473, at *1. Furthermore, if Lutronic has instituted a litigation hold, an evidence
/////

preservation order will merely preserve the status quo and Lutronic will be essentially unaffected by it.

Second, although Lutronic argues a forensic examiner can easily retrieve deleted data, and therefore no irreparable harm is likely, Cutera's forensic examiner states that, at least on Mr. Laber's laptop, the "artifacts typically used to determine what files or folders were transferred have been deleted or otherwise cleared." Clarke Decl. ¶ 10. This suggests there are methods by which a savvy user can erase the traces of his or her activity on the laptop so as to make information and activity unrecoverable, and at least one Former Cutera Employee has likely employed such methods. Thus, irreparable harm, in the form of lost evidence, is likely to result in this way if no evidence preservation order is entered.

Third, because the Former Cutera Employees are now Lutronic employees, an evidence preservation order issued against Lutronic and its agents would apply to those individuals who have the capability to maintain the evidence sought to be preserved.

Accordingly, the court GRANTS Cutera's request for an evidence preservation order, as detailed below.

VI.    <u>CONCLUSION</u>

The court GRANTS in part Cutera's motion for a temporary restraining order against Lutronic, Inc., the terms of which the court provides below. The court has tailored the TRO to conform to the showing made by Cutera; it declines to grant the elements of the requested TRO that are overbroad or unnecessary to prevent the irreparable harm alleged. Given this narrowing of the TRO, the court need not reach Lutronic's arguments based on California Business and Professions Code section 16600.

Lutronic's related request to seal, ECF No. 20, is DENIED as MOOT, as described above.

TEMPORARY RESTRAINING ORDER

The court hereby ORDERS as follows:

1.    Good cause exists for issuance of a Temporary Restraining Order as plaintiff Cutera, Inc. has shown (1) the likely existence of protectable trade secret information and

17

that defendant Lutronic Aesthetics, Inc.'s use or threatened use of said trade secret information will likely damage plaintiff by causing plaintiff loss of business and business advantage; (2) irreparable harm will likely occur absent an injunction as lost business and business advantage cannot be repaired with a monetary award; (3) the balance of equities favors plaintiff as the effect of the injunction is to preserve the status quo; and (4) injunctive relief would support the strong public interest in favor of protecting trade secrets.

2. Pending hearing on the Order to Show Cause issued below, defendant Lutronic Aesthetics, Inc., as well as all of its affiliates, officers, directors, shareholders and employees (including the Former Cutera Employees as defined above) (together, "Defendant") and its related entities (together "Lutronic") is hereby RESTRAINED, ENJOINED AND ORDERED as follows:

  a. Defendant Lutronic is ENJOINED AND RESTRAINED from, for the benefit of Lutronic or otherwise, directly or indirectly, obtaining, retaining, using, transmitting, disseminating, or disclosing, or attempting to obtain, retain, use, transmit, disseminate,  or disclose, any Cutera confidential, proprietary, or trade secret information, including any Cutera product, customer (actual or potential), sales, marketing, or pricing information ("Cutera Trade Secret Information"); and

  b. Defendant Lutronic is ENJOINED AND RESTRAINED from using the Cutera Trade Secret Information for the purpose of directly or indirectly soliciting, and for the purpose of conducting business with, any Cutera actual or potential customer with whom any of the Former Cutera Employees had business contact or communications, or called upon, during the one (1) year period prior to date this Order is issuing.

This temporary restraining order is effective on plaintiff's filing proof with the Clerk's office that it has posted a bond in the sum of $5,000.

/////

/////

## ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

Defendant Lutronic is ordered to appear on **April 24, 2020 at 10 a.m.** before Judge Kimberly J. Mueller in Courtroom 3 of the United States Courthouse located at Robert T. Matsui United States Courthouse, 501 I Street, Sacramento, California 95814, to show cause why a preliminary injunction should not be granted and why it should not be RESTRAINED and ENJOINED pending trial as follows:

1.      ENJOINED AND RESTRAINED from, for the benefit of Lutronic or otherwise, directly or indirectly, obtaining, retaining, using, transmitting, disseminating, or disclosing, or attempting to obtain, retain, use, transmit, disseminate,  or disclose, any Cutera confidential, proprietary, or trade secret information, including any Cutera product, customer (actual or potential), sales, marketing, or pricing information ("Cutera Trade Secret Information");

2.      ENJOINED AND RESTRAINED from using the Cutera Trade Secret Information for the purpose of directly or indirectly soliciting, and for the purpose of conducting business with, any Cutera actual or potential customer with whom any of the Former Cutera Employees had business contact or communications, or called upon, during the one (1) year period prior to date of a preliminary injunction order, for a period of two (2) years from the date the Former Cutera Employees left employment with Cutera on January 17, 2020;

3.      REQUIRED to identify all desktop and laptop computers, internal and external hard drives, USB storage devices, "flash drives," "thumb drives," memory cards, non-commercial read/writable optical media (including CD-ROMs and DVD-ROMs), cloud storage (including iCloud and DropBox) accounts, personal email accounts, tablet devices (including iPads), and smart phones (collectively "Media"), belonging to or in the Former Cutera Employees' possession, custody, or control that (a) have been used by the Former Cutera Employees during the two year period prior to the entry of this Order to perform business or services for Cutera; (b) have been used by the Former Cutera Employees to perform business or services for Lutronic; or (c) that Lutronic, in good faith, believes contain any Cutera Trade Secret Information (together the "Identified Media");

/////

19

4.    REQUIRED to produce, within three (3) business days, the Identified Media to Cutera or allow Cutera's agents, including independent computer forensic experts, to forensically preserve and mirror/image said Identified Media (the mirrored data shall be maintained by Cutera's counsel as highly confidential – Attorneys' Eyes Only until such time as the Court designates any portion thereof);

5.    REQUIRED to identify all passwords and processes necessary to obtain access to any operating system, database, server, software, file, or storage location (including on-line or "cloud" storage) for said Identified Media;

6.    REQUIRED, within three (3) business days, to the extent it has not already done so, to return to Cutera any and all Cutera materials containing Cutera Trade Secret Information, in their possession, custody, or control, including, but not limited to, whether original or duplicate, emails, documents, records, files that the Former Cutera Employees removed, obtained, or otherwise derived from Cutera's offices or current or former employees or contractors of Cutera, and including information pertaining to Cutera's products, customers, sales or marketing activities.

Furthermore, to the extent Cutera has a more detailed list of the information it considers to be trade secrets that it alleges Lutronic has misappropriated, Cutera SHALL file that list with the court with a service copy on Lutronic within 14 days of this order.  The trade secrets in this list shall be defined with the degree of particularity required by applicable federal and state law.  *See TMX Funding, Inc. v. Impero Techs., Inc.*, No. C 10-00202 JF (PVT), 2010 WL 2509979, at *3 (N.D. Cal. June 17, 2010) (describing particularity requirement) (citing *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 253 (Cal. App. 2d 1968).  Lutronic SHALL respond to this OSC within 14 days preceding the noticed hearing date, and Cutera may reply within 7 days before the noticed hearing date.

The restraining order granted in this order takes effect immediately upon filing of this order on the court's docket and shall expire on the date of the court's hearing on the preliminary injunction motion, providing the parties time to exchange in limited discovery to clarify the record as relevant to the question whether a preliminary injunction should be entered.

If Lutronic does not consent to the duration of the temporary restraining order through the date currently set for the preliminary injunction hearing, it shall notify the court promptly and no later than **March 19, 2020**.

ORDER RE: PRESERVATION OF EVIDENCE

IT IS FURTHER ORDERED THAT:

Defendant Lutronic, as well as all of its affiliates, officers, directors, shareholders and employees (including the Former Cutera Employees, as defined in Cutera's application) (together, "Defendant") SHALL preserve all evidence in accordance with applicable state rules, and CEASE, DESIST AND REFRAIN from accessing, retrieving, copying, deleting, destroying, removing, altering, modifying, concealing, spoliating, secreting, transmitting or disseminating any documents or information relating to this lawsuit in any way, no matter where such information resides, including any documents or information stored on any computer or Media. Documents shall be defined as in the California Code of Civil Procedure. This order includes all documents relating to Cutera's Trade Secret Information (as defined in the temporary restraining order), business information pertaining to Cutera's products, customers, sales or marketing activities, the Former Cutera Employees' employment with Cutera or Lutronic, and defendants' communications (including emails, texts, WhatsApp and iMessages, chats) with Cutera and/or Lutronic, as well as employees, contractors, customers, competitors, vendors, suppliers or agents since February 15, 2019, the earliest date of contact between any of the Former Cutera Employees and Lutronic, according to the record. Clarke Decl. ¶ 10.

IT IS SO ORDERED.

DATED: March 12, 2020.

_____
CHIEF UNITED STATES DISTRICT JUDGE